# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LAMERLE SUNDY HUGHES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:08-cv-101-SEB-WGH |
| | ) | |
| CUNA MUTUAL LONG TERM | ) | |
| DISABILITY INSURANCE, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This cause is before the Court on cross-motions for summary judgment [Docket Nos. 75 and 82], both filed on July 31, 2009, by Plaintiff Lamerle Sundy Hughes and Defendant CUNA Mutual Long Term Disability Insurance. Ms. Hughes alleges that CUNA wrongfully denied her long term disability benefits, in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001. Defendant contends that it fully satisfied its obligations under the Plan by providing Ms. Hughes a full and fair review of her claim and is entitled to a judgment to that effect. For the reasons detailed in this entry, we <u>DENY</u> Plaintiff's Motion for Summary Judgment and <u>GRANT</u> Defendant's Motion for Summary Judgment.

## <u>Factual Background</u>

For eighteen years, Ms. Hughes was employed by Drover Street Federal Credit

Union ("the Credit Union")[1] as the Vice President of Lending.  Her job responsibilities

generally consisted of overseeing the day-to-day operations of the lending and collections

department, including monitoring and analyzing economic conditions affecting the

department.  As an employee of the Credit Union, Ms. Hughes was a participant in its

employee welfare benefit plan, referred to as CUNA Long Term Disability Insurance

("the Plan").  The Plan is insured and administered by CUNA Mutual Group.

**The LTD Plan**

Pursuant to the terms and conditions of the Plan, CUNA has "the sole authority to

manage the Policy to administer insurance claims, to interpret Policy provisions, and to

resolve insurance questions arising under the Policy."  (R. at 6).  CUNA is also authorized

to "determine Employees' eligibility for insurance and entitlement to insurance benefits."

Id.  Any decision made by CUNA in the exercise of its authority is considered conclusive

and binding.  Id.

Under the policy, "total disability" and "totally disabled" are defined as follows:

> **Total Disability or Totally Disabled** means during the Elimination Period
> and the next 36 months of disability You are unable to perform, with
> reasonable accommodation, all of the Material and Substantial Duties of
> Your Own Occupation because of an Injury, Sickness, Mental/Nervous
> Disorder, Substance Abuse, or Subjective Disorder.
>
> After 36 months of benefits have been paid, it means because of an Injury,
> Sickness, Mental/Nervous Disorder, Substance Abuse or Subjective
> Disorder You are unable to consistently perform, with reasonable

---

[1] Drover Street Federal Credit Union is now known as Horizon One Federal Credit
Union.

accommodation, all the Material and Substantial Duties of any gainful occupation for which You are or could reasonably become qualified by training, education, or experience.

(R. at 18). When the primary cause of an insured's total disability is a mental or nervous disorder or a subjective disorder, benefits are payable only for twenty-four months. This limitation is spelled out in the following Plan provision:

### 5.3 LIMITATION FOR SPECIFIED DISORDERS

When the primary cause of Total Disability or Partial Disability is a Mental/Nervous Disorder or Substance Abuse, Monthly Benefits will be limited to a maximum of 24 months during Your lifetime. If You are confined in a Hospital or Institution at the end of the 24 month period, We will pay the Monthly Benefit during the Confinement up to a maximum of 90 days.

When the primary cause of Total Disability or Partial Disability is a Subjective Disorder, Monthly Benefits will be limited to a maximum of 24 months during Your lifetime. If You are Confined in a Hospital or Institution at the end of the 24 month period, We will pay the Monthly Benefit during the Confinement up to a maximum of 90 days.

**Subjective Disorder** means Chronic Fatigue Syndrome, Fibromyalgia, Fibrositis, Chronic Pain, Environmental Sensitivity Disorder, and any and all disorders that cannot be documented by specific test results or objective findings.

**Mental/Nervous Disorder** means neurosis, psycho neurosis, psychopathy, psychoses, depression, eating and sleeping disorders, or mental or emotional diseases or disorders of any kind that are classified in the Diagnostic and Statistical Manual of the American Psychiatric Association (DSM) in effect as of the beginning date of Total Disability or Partial Disability, including those caused by chemical imbalance. It does not include dementia, organic brain syndrome, delirium, amnesia syndromes or organic delusional syndromes.

(R. at 30, 1022) (emphasis in original).

**Plaintiff's July 2004 LTD Claim**

At the time of her initial application for disability benefits in July 2004, Ms. Hughes's duties as Vice President of Lending were sedentary in nature. According to a disability statement completed by Ms. Hughes on September 14, 2004, she had become unable to work due to chronic pain, fibromyalgia, and anxiety. (R. at 347). Ms. Hughes contends she also suffered from osteoarthritis, severe back pain with contributions from sciatic neuropathy and superimposed L5-S1 radiculopathy with degenerative disc disease and facet arthritic changes, recurring headaches, and depression. (R. at 589). In support of her July 2004 LTD claim, Ms. Hughes submitted Attending Physician Statements from Kevin Coss, M.D., and Andrea Haller, M.D., her neurologist. Ms. Hughes also submitted records from her rheumatologist, Harry Staley, M.D., her orthopedist, Edward Todderud, M.D., and her chiropractor, Richard Hilton, as well as physical therapy notes, radiology reports, and x-rays.

Dr. Staley had initially evaluated Ms. Hughes two years prior, on September 24, 2002. In that evaluation, he diagnosed Ms. Hughes with fibromyalgia, osteoarthritis in both hands, Raynaud's phenomenon, symptoms of intermittent claudication in the lower extremities, and a history of acid reflux, anxiety, and mixed anxiety/depression. (R. at 975-76). Dr. Staley's notes from Ms. Hughes's office visit in October and November 2002 indicate that Ms. Hughes complained at that time of pain and stiffness in her neck and back. (R. at 977). Office notes dated January 7, 2003 indicate that Ms. Hughes no longer experienced constant neck pain but that she had "some fatigue as a result of a

4

stressful job at the Credit Union." (R. at 768). She returned to Dr. Staley on March 11, 2003, complaining of joint pain, fatigue, and feeling "out of sorts." (R. at 766). On April 2, 2003, Dr. Staley opined based on his examinations that Ms. Hughes suffered from fibromyalgia, depressive reaction, and osteoarthritis in the hands. Ms. Hughes reported that she was under a lot of stress at work and that she was having difficulties coping with her boss. (R. at 764). Ms. Hughes again visited Dr. Staley on September 1, 2003, reporting that she was very fatigued, "in a fog," and "unable to follow through," and was seeing a psychiatrist for depression medication. (R. at 762). Dr. Staley again diagnosed her with fibromyalgia, osteoarthritis of the hands, and depression. Id. On September 30, 2003, Ms. Hughes returned to see Dr. Staley and he repeated his diagnosis of fibromyalgia, osteoarthritis in the hands, and positive ANA with polyarthralgias. (R. at 760). Her diagnosis remained unchanged through her January 5, 2004 visit to Dr. Staley and her fibromyalgia diagnosis continued through February 5, 2004, when diagnoses of degenerative cervical disc disease and partial tear of the right rotator cuff were added. (R. at 756, 758-59). On June 24, 2004, Dr. Staley's diagnosis of Ms. Hughes was unchanged as to her fibromyalgia, noting that her pain was diffuse and compatible with the disorder, as well as the positive ANA finding of uncertain clinical significance. (R. at 752).

Ms. Hughes consulted Dr. Coss on June 18, 2003, prompting him to conclude that she had a history of possible mixed connective tissue disease with fibromyalgia and rheumatoid arthritis. He diagnosed her condition as fibromyalgia and postmenopausal depression with anxious features. (R. at 977). Eight months later, on February 13, 2004,

Dr. Coss again diagnosed Ms. Hughes with fibromyalgia, right shoulder pain, and minimally symptomatic lumbar sacral disc disease.  (R. at 558-59).  Ms. Hughes had a follow up visit with Dr. Coss on May 13, 2004, during which she reported complaints of fatigue, difficulty concentrating, and anxiety.  With the exception of reports of multiple trigger points, Ms. Hughes's objective examination was essentially normal.  Dr. Coss noted that "her primary diagnoses would include osteoarthritis, and primarily fibromyalgia," as well as depression with anxious features.  (R. at 563).  In his May 13 notes, Dr. Coss indicated that in his opinion "her disability is probably multifactorial related to her chronic pain management, psychiatric issues regarding depression with anxious features which are obviously difficult to quantitate and are more subjective which makes disability determination more difficult."  (R. at 564).  In his Attending Physician Statement dated July 15, 2004, Dr. Coss issued a primary diagnosis of "[c]hronic pain syndrome, primarily associated with fibromyalgia with history of mixed connective tissue disease."  (R. at 568).

In correspondence dated May 27, 2004 from Dr. Haller to Dr. Coss, Dr. Haller indicated that Ms. Hughes had been diagnosed with fibromyalgia twelve to fifteen years earlier.  (R. at 530).  Dr. Haller noted his impression that Ms. Hughes suffered from fibromyalgia as opposed to myofascial pain syndrome, multifactorial headache syndrome, anxiety, depression, probable peripheral vestibulopathy, and possible cervical myelopathy.  (R. at 532-33).  Subsequent correspondence dated June 17, 2004 again between Dr. Haller and Dr. Cross reflected that the diagnosis remained unchanged.  (R. at

526).  Dr. Haller's office notes for June 17 indicate that Ms. Hughes was on medications for anxiety and depression, including Paxil and Wellbutrin.  He also documented a diagnosis of fibromyalgia rather than myofascial pain, headaches, anxiety and depression, and possible cervical myelopathy and restless leg syndrome, noting that, although Ms. Hughes had degenerative disease in her cervical spine, she had no cervical radiculopathy.  Thus, Dr. Haller was uncertain as to the precise cause of her pain.  However, Dr. Haller was of the view that Ms. Hughes's anxiety and depression were contributing to her overall pain syndrome.  (R. at 528).

In a January 12, 2004 letter from Dr. Todderud to Dr. Coss, Dr. Todderud documented Ms. Hughes's complaints of neck pain, though she had good range of motion and was neurologically intact.  (R. at 258-59).  Two months later, on March 23, 2004, Dr. Todderud noted these same findings.  (R. at 262).  In his April 26, 2004 notes, Dr. Todderud reported that Ms. Hughes's past MRIs and CT scans of the lumbar spine showed "marked" degenerative changes with no impingement and that x-rays of Ms. Hughes's lower back did not show any compression fractures.  Dr. Todderud had examined Ms. Hughes that same day and determined that she had full range of motion in all areas, but that there was some evidence of sciatica.  He also noted that Ms. Hughes was suffering from shoulder pain, chronic neck pain, low back pain with right hip pain and leg pain, bilateral foot pain and swelling, and left knee pain.  (R. at 260-61).  At her July 20, 2004 appointment, Ms. Hughes's complaints of pain in multiple areas on her body continued, but Dr. Todderud noted that, although prior MRI findings showed

degenerative disc disease, they did not reveal definite root impingement. (R. at 263).

Ms. Hughes submitted her medical records to CUNA from Richard Hilton, D.C., associated with New Palestine Chiropractic. Dr. Hilton diagnosed Ms. Hughes with sacroiliac syndrome, cervical spine intersegmental dysfunction, and myofascitis, and prepared a treatment plan that included spinal manipulation and myofascial trigger point therapy twice per week for four weeks. (R. at 979).

On August 24, 2004, CUNA submitted Ms. Hughes's medical information for review by Sharon A. Smith, Ph.D., a licensed psychologist, and Mark Johnson, M.D., a board-certified internal medicine specialist. Neither Dr. Smith nor Dr. Johnson evaluated Ms. Hughes in person. Dr. Johnson did speak personally with Dr. Coss, who, according to Dr. Johnson's report, did not dispute his conclusion that Ms. Hughes's impairments were based on her subjective reporting of symptoms unsupported by any objective findings of an impairing or inflammatory condition. Dr. Coss recommended that Ms. Hughes enroll in a chronic pain program that would provide her with appropriate psychiatric and psychological therapy. (R. at 979). Dr. Johnson reviewed Dr. Coss's records and determinated that no laboratory testing or physical imaging of an inflammatory condition supported a finding of total disability, and that, based on treatment notes, Ms. Hughes's primary diagnosis was fibromyalgia but not rheumatoid arthritis or lupus. (R. at 980-82).

After review of the remaining submitted medical records, Dr. Johnson concluded that Dr. Staley had determined that Ms. Hughes had a diffuse musculoskeletal syndrome

characterized by widespread pain and stiffness in many areas of her body, and that she

had a current working diagnosis of fibromyalgia/chronic myofascial pain syndrome.

Regarding her orthopedic treatment by Dr. Todderud, Dr. Johnson concluded that the

medical records did not reveal any degenerative changes that would impair her ability to

perform sedentary work. Tests performed in response to Ms. Hughes's reports of

dizziness yielded normal findings, suggesting those complaints were also subjective. Dr.

Johnson also interpreted Ms. Hughes's radiology reports to show degenerative changes,

but no significant impairment that would prevent her from engaging in sedentary work.

(R. at 980-81).

In deciding whether Ms. Hughes was impaired from her occupation, Dr. Johnson

opined as follows:

> Considering all the information available, including my conversation with
> Dr. Coss, I cannot find objective documentation of a specific medical
> condition that causes such a degree of impairment that she cannot work in
> her occupation. Her diagnosis are Fibromyalgia/Chronic Fatigue
> Syndrome/Chronic Myofascial Pain Syndrome, which Dr. Coss agrees is a
> somewhat nebulous description for her many subjective complaints. It is
> his opinion that the symptoms she reports are sufficiently severe to cause
> her to be impaired. He also believes that it is reasonable and appropriate for
> Ms. Hughes to remain off work as she enters and continues in the chronic
> pain program. This, however, has yet to occur despite several references,
> and there is no medical documentation of an acute deterioration in her
> condition that made work absence beginning 6/21/04, and continuing,
> medically necessary.

(R. at 981-82). Dr. Johnson continued: "There is no objective or anatomical evidence of

severe musculoskeletal problems, and her current limitations and restrictions are based on

her subjective symptom reporting. I have no evidence in the file to show that Ms. Hughes

9

is physically impaired from sedentary activities." (R. at 982). Dr. Smith's review of the medical records caused her to conclude as well that the available medical information did not support a finding of disability from a mental health condition. Id.

On September 15, 2004, based on the opinions of Drs. Smith and Johnson, CUNA denied Ms. Hughes's LTD claim. CUNA's letter to Ms. Hughes memorializing this decision stated in relevant part as follows:

> The information received was sent to Independent Physicians for a file review of all the medical documentation submitted. The medical information was reviewed by Dr. Mark Johnson and by Sharon Smith, PhD. The conclusion from Sharon Smith PhD indicated that the information in the file does not support any functional limitations or impairment due to mental health conditions. Dr. Johnson indicated there is no evidence that you are physically impaired from sedentary activities and he does not find you impaired from performing your job as Vice President of Lending. Therefore, after reviewing the medical information and the report from the Independent Physicians it is determined that your claim is denied for Long Term Disability benefits because you do not meet the definition of totally disabled.

(R. at 1092). The letter from CUNA also set out the appeal process which Ms. Hughes could follow to challenge these conclusions, indicating as well that Dr. Coss had been sent a copy of the report from Drs. Johnson and Smith. CUNA informed Ms. Hughes that if she sought any further consideration of her claim, she must provide medical documentation to support her inability to perform her occupation along with a narrative from Dr. Coss addressing his reasons for disagreeing with the opinions of Drs. Johnson and Smith. (R. at 1093).

**September 2004 Appeal of Denial of Benefits**

On September 27, 2004, Ms. Hughes appealed CUNA's denial of her claim. In support of her appeal, Ms. Hughes submitted additional records from Dr. Haller, correspondence from Dr. Coss, additional records from Dr. Coss, records from the Indiana Orthopedic Center, x-rays and other radiograph studies, physical therapy notes, and Ms. Hughes's job description. The next day, on September 28, 2004, CUNA's ERISA Review Committee ("the Committee") met and determined that consideration of Ms. Hughes's appeal should be deferred, pending receipt of the requested narrative report from Dr. Coss and Ms. Hughes's pharmacy records from July 1, 2004, forward. On October 20, 2004, the Committee again conferred and deferred its decision, pending a full second review by Dr. Johnson of the new medical evidence, set to occur on November 16, 2004. However, on November 24, 2004, the Committee again deferred a decision on Ms. Hughes's appeal, pending a review by a third-party physician other than Dr. Johnson. On January 6, 2004, all of Ms. Hughes's medical records were reviewed by Elinor Mody, M.D., a rheumatologist, and Richard Silver, M.D., an orthopedist.

The additional evidence submitted by Ms. Hughes included an abnormal EMG and nerve conduction study of her right lower extremity, dated September 1, 2004, revealing evidence of mild sciatic neuropathy as well as a superimposed L5 and S1 nerve root irritation that was mild but chronic in nature. (R. at 482-83). The EMG indicated "no definite electrophysiologic evidence of a peripheral polyneuropathy, peripheral entrapment neuropathy or other lumbosacral radiculopathies." Id. Ms. Hughes also

submitted a September 9, 2004 MRI report revealing that her degenerative disc disease had worsened since her prior MRI and that variable moderate to severe facet arthritic changes had occurred with thickening of the ligamentum flavum at the L3-4 and L4-5 levels bilaterally and predominately on the right side at the L5-S1 level. (R. at 484-85). A prior MRI, performed on June 3, 2004, revealed the following: "There is mild spondyloarthrosis at multiple cervical segments. There is inflammatory facet degenerative osteoarthritis on the right side at C4-5. Recommend clinical correlation with site of patient's pain. Oftentimes, inflammatory facet osteoarthritis results in pain localized over the facet joint and will refer along the ipsilateral paraspinous muscles." (R. at 487). However, the June 3 MRI showed no neural compression or significant spinal stenosis. Id.

In an Attending Physician Statement dated September 9, 2004, Dr. Haller reported that Ms. Hughes's condition had "regressed" and indicated that Hughes suffered from a marked limitation on mental impairments, and, with regard to physical impairments, exhibited a "[s]evere limitation of functional capacity; incapable of minimum (sedentary) activity." (R. at 447-48). On that same form, Dr. Haller noted that she had reviewed Ms. Hughes's job description and that modifications would not allow Hughes to return to work. (R. at 448). On September 15, 2004, Dr. Haller diagnosed "[m]ultifactorial right lower extremity pain with contributions from mild sciatic neuropathy and superimposed L5-S1 radiculopathy with degenerative disk disease and facet arthritic changes on MRI at consistent levels." (R. at 491). Dr. Haller also noted possible small vessel ischemic

12

disease with several areas of T2 hyperintensity, fibromyalgia versus myofascial pain, chronic pain syndrome with fibromyalgia, degenerative disease of the cervical and lumbar spine, sleep disorder, anxiety and depression, multifactorial headache syndrome, probable peripheral vestibulopathy, and diffuse hyperreflexia with no evidence of cortical abnormality on cervical spine MRI.  (R. at 491-92).

Herbert Biel, M.D., an orthopedist, diagnosed Ms. Hughes on October 11, 2004 with lumbar instability and discogenic low back pain with referred right leg pain.  Upon review of Ms. Hughes's x-rays, Dr. Biel reported that she suffered from degenerative spondylolisthesis of L4 on L5 and severe disc space narrowing at L3-4 and L4-5.  (R. at 500).  On November 8, 2004, Ms. Hughes returned to Dr. Biel's office with continuing complaints of back pain.  Dr. Biel reported that he believed Ms. Hughes "has a mechanical problem in her low back which is causing a good deal of her complaints."  (R. at 499).

On October 18, 2004, Dr. Coss completed a response to Dr. Johnson's August 24, 2004 report, stating in relevant part as follows:

> [Ms. Hughes] was encouraged to take a medical leave starting June 28, 2004 because of exacerbating symptoms of right hip and right lower extremity pain, that were refactory to conservative therapy.  In fact the patient did receive an injection by an orthopedic specialist for bursitis in July and also received an injection for pain by her rheumatologist on June 20, 2004 because of exacerbation of symptoms.  The patient was unable to tolerate prolonged sitting which was interfering with her ability to perform adequately at work. . . . It was my opinion that the patient was unable to perform adequately at work beginning June 28, 2004.  I am asking that you reconsider the request for disability based on my interpretation of the information provided.

(R. at 574).  Dr. Coss also noted that Ms. Hughes had experienced an exacerbation of her fibromyalgia and recommended a pain management program to address the issue.  Id.

After reviewing the additional information submitted on appeal, on November 16, 2004, Dr. Johnson again concluded that Ms. Hughes could perform her duties at work, stating that there "is no indication that full-time employment as Vice President of Lending will cause her any tissue damage or other injury, or that it would interfere with the proper management of her symptoms."  (R. at 974).  In support of his determination, Dr. Johnson noted that the June 3, 2004 MRI of the cervical spine showed no neural compression or significant spinal canal stenosis, and that the September 2004 lumbar MRI did not explain her symptoms.  (R. at 972-73).  He also referenced the fact that the September 1, 2004 EMG showed no definite evidence of a peripheral polyneuropathy or radiculopathy.  (R. at 972-73, 974).  In response to the opinions of Ms. Hughes's treating physicians, Dr. Johnson concluded that, although Dr. Haller diagnosed Ms. Hughes with many ailments, there was "very little documentation of an organic or anatomical basis for her symptoms," (R. at 973), and that Dr. Coss's conclusion that Ms. Hughes could not perform her job was "guided solely by her [Hughes's] subjective symptom reporting."  (R. at 974).

As noted above, following Dr. Johnson's review, CUNA's ERISA Review Committee decided to have additional third-party physicians review Ms. Hughes's medical records before making its determination as to her eligibility for benefits.  Thus, per CUNA's request, on January 6, 2005, Dr. Mody, a board-certified internist and rheumatologist, reviewed Ms. Hughes's medical records and opined only that "Ms.

14

Hughes, from a Rheumatology perspective, based on review of the records, is not disabled from performing the duties of her occupation, as listed on the job description, either on a full-time or part-time basis." (R. at 957).

Dr. Silver, a board-certified orthopedist and Fellow in the International College of Surgeons, American Academy of Disability Evaluating Physicians, and American College of Forensic Examiners, also performed a records review. Dr. Silver opined in relevant part that:

> Ms. Hughes has mild impairment of the cervical spine, right shoulder, and the lumbosacral spine. From an orthopedic standpoint as stated earlier, there is no loss of functionality of the cervical, thoracodorsal, nor the lumbosacral spine. There is no focal neurologic deficit in the upper or lower extremities bilaterally, nor is there any focal neurologic deficit clinically documented in the upper and lower extremities bilaterally that leads to a loss of functionality.

(R. at 952). Although Dr. Silver acknowledged that Ms. Hughes's diagnoses "are appropriate by her treating and attending consulting physicians," he also ultimately concluded that she was capable of performing the duties of her occupation on a full-time basis. (R. at 952-53). Dr. Silver did not expound further on his reasons for departing from the opinions of Drs. Coss and Haller regarding Ms. Hughes's ability to perform her job.

On January 11, 2005, based on the reviews of Drs. Johnson, Mody, and Silver, the Committee upheld its original denial of benefits, and notified Ms. Hughes of its decision on January 14, 2005. The relevant portion of that notification stated as follows:

The information from Dr. Mody indicates that from a Rheumatology

15

perspective based on the review of the records, you are not disabled from performing your occupation. Dr. Silver also indicated from an orthopedic perspective you are not disabled from performing your occupation of loan managing manager supervisor from an orthopedic standpoint. Further, Dr. Silver does not find that the records support that any of the numerous other alleged diagnoses; rheumatoid arthritis, systemic lupus erythematosus, or fibromyalgia versus myofascial pain syndrome, are causing impairment that would preclude you from performing your normal occupation. Both physicians have indicated that the mental/nervous issues are outside of their area of speciality.

Your claim file was also reviewed prior per the report dated August 24, 2004 by Dr. Sharon A. Smith, PhD, Licensed Psychologist, a third party physician, regarding the mental/nervous issues in your claim file to determine if you are considered unable to perform your occupation due to a mental/nervous diagnosis. Dr. Smith indicated that there is insufficient medical information or documentation of symptomology in these files to substantiate mental health impairment or functional limitations or restrictions. Therefore, you have not been found to be unable to perform your occupation due to a mental/nervous disorder.

(R. at 1081-82).

## April 2005 Appeal of Denial of Benefits

On April 28, 2005, Ms. Hughes submitted a second appeal of CUNA's denial.

With her appeal, Ms. Hughes included a statement from Ann Garmon, the President and

CEO of the Drover Street Credit Union, attesting in relevant part as follows:

I would like to share with you some observations of mine during the last year of Ms. Hughes['s] employment at the credit union.

I observed that Ms. Hughes appeared to be in a lot of discomfort. She obviously was in pain. Her mobility was limited as well as her ability to sit for long periods of time. She seemed to have memory lapses, was confused and disoriented at times. Her ability to do her normal job was affected by all of this. She missed a considerable amount of time from work due to doctor appointments and Family Medical Leave.

(R. at 215). In addition to Ms. Garmon's statement, Ms. Hughes submitted additional medical records from Dr. Haller and Dr. Staley. Dr. Haller's records indicated that Ms. Hughes was diligently seeking all available treatment for her conditions, including trigger point injections. (R. at 217; see 228-292). Dr. Staley reported that he had diagnosed Ms. Hughes as suffering from fibromyalgia, osteoarthritis, positive ANA with polyarthritis, degenerative cervical disc disease and facet arthritis, partial tear of her right rotator cuff, and sclerosis of the symphysis pubis. (R. at 217, 294).

On June 2, 2005, CUNA requested that Ms. Hughes undergo an independent medical examination ("IME"), citing the applicable policy provision giving it the right to make such a request. (R. at 1075). Ms. Hughes was at first resistant to submitting to the IME, arguing that it was untimely, but agreed to proceed if she were permitted to videotape the exam with a witness; bring her own medical records; obtain a copy of the report after the exam and allow her physicians to respond to it; obtain a copy of the IME physician's curriculum vitae; and receive an explanation from CUNA as to why the IME was considered necessary. (R. 891-892). CUNA agreed to these conditions and, on August 1, 2005, Marc Deurden, M.D. conducted Ms. Hughes's IME. Dr. Deurden is board-certified in physical medicine, rehabilitation, and spinal cord injury medicine, and is a member of the American Board of Independent Medical Examiners and American Board of Disability Analysts, as well as a Clinical Associate Professor at Indiana University School of Medicine. He currently holds a consulting position with an insurance company, American United Life, and has previously acted as a consultant for

Anthem Insurance, Fortis Insurance, and Cigna Insurance. Dr. Deurden's examination of Ms. Hughes took approximately two hours and forty-five minutes.

During the IME, Dr. Deurden obtained Ms. Hughes's health history, including her diagnosis of fibromyalgia ten to fifteen years before. Ms. Hughes reported that she experienced high anxiety levels. Upon physical examination, Ms. Hughes was able to ambulate with a normal gait as well as walk on her heels and toes. Her range of motion in her lumbar spine appeared to be within functional limits and she also had fair range of motion in her cervical spine with no guarding. However, Ms. Hughes did report tenderness throughout this area. Ms. Hughes was found to have normal range of motion in both shoulders, elbows, wrists, fingers, hips, knees, and ankles. She demonstrated two out of eighteen tender points relevant to the diagnosis of fibromyalgia. She exhibited some weakness in her bilateral upper extremities, but had good muscle strength and reflexes in the upper and lower extremities. Ms. Hughes complained of some back pain, and had superficial tenderness through her lumbar spine and inconsistent regional weakness in her upper and lower extremities. (R. at 946). The test of her right hand strength was invalid, but her left hand test grip strength seemed normal. Dr. Duerden noted that she appeared to be giving submaximal effort bilaterally. (R. at 947).

In his report based on the IME, Dr. Deurden identified various diagnostic tests that had been conducted to assess Ms. Hughes's medical condition. (R. at 945). A March 4, 2003 echocardiogram was normal. (R. at 323). A June 29, 2002 lumbar spine MRI showed degenerative disc disease from L2-L4 with no definite root impingement. (R. at

143). A September 14, 2003 cervical spine x-ray was normal. (R. at 277). A September

14, 2003 CT of the head was normal. (R. at 278). A December 29, 2003 cervical spine

MRI showed some joint degeneration, but no hemorrhage or stenosis. (R. at 137). An

audiogram and balance test that were performed on May 20, 2004, were both normal. (R.

at 536). A September 9, 2004 MRI of the lumbar spine showed mild degenerative disc

disease changes with minimal bulging, but no specific abnormality that would explain

Ms. Hughes's right leg symptoms. (R. at 141). A September 9, 2004 MRI of the brain

showed incidental findings that did not explain Ms. Hughes's symptoms. However, Dr.

Dreuden omitted a June 3, 2004 cervical MRI, which revealed mild spondyloarthrosis at

multiple cervical segments and inflammatory facet degenerative osteoarthritis of the

cervical spine at C4-5, (R. at 486-87), and a September 1, 2004 abnormal EMG/nerve

conduction study revealing mild sciatic neuropathy and some superimposed L5 and S1

nerve root irritation. (R. 482-83; <u>see</u> R. at 936). Dr. Duerden also did not discuss Ms.

Hughes's positive ANA test. (<u>See</u> R. at 933).

 After completing the examination and reviewing the diagnostic tests, Dr. Duerden

concluded that "Ms. Hughes['s] chronic pain symptoms do not meet the operational

diagnosis for fibromyalgia. She does have a generalized fatigue. Her pattern of pain is

more consistent with a generalized chronic pain syndrome." (R. at 938). He also

reported that Ms. Hughes had a significant amount of psychological overlay to her

physical/somatic pain symptoms. (R. at 939). Dr. Duerden ultimately opined that Ms.

Hughes should be able to perform her occupation at the sedentary level, but that she

would require "frequent rest breaks and may need to be able to be employed on a part time basis." (R. at 938). Dr. Duerden considered Ms. Hughes's "self reported functional status" in his report, but did not address the medical opinions of Ms. Hughes's treating physicians. (See R. at 932-40).

**Defendant Approves Plaintiff's LTD Claim for 24 Months**

On August 10, 2005, CUNA approved Ms. Hughes's long-term disability claim effective July 27, 2004. However, CUNA explained that, because the primary diagnoses for her disability were considered mental/nervous and subjective disorders, she was subject to the "Limitation for Specified Disorders" provision of the Plan, and thus, her benefits would be limited to twenty-four months. (R. at 1064-65). On August 23, 2005, Ms. Hughes wrote to CUNA disputing that her disability fell within the limitation provision and asserting that her inability to work was due to impairments other than a mental/nervous disorder or a subjective illness. (R. at 869). On September 20, 2005, CUNA responded, referencing Dr. Coss's diagnosis of fibromyalgia on her initial claim form and Dr. Duerden's report that her pain was consistent with a generalized pain disorder and that she complained of high anxiety. CUNA also invited Ms. Hughes to submit medical evidence disputing a primary disability of fibromyalgia/chronic pain syndrome and anxiety if such evidence was available. (R. at 1056-57).

There appears to have been no further correspondence between CUNA and Ms. Hughes until nine months later, on April 26, 2006, when CUNA advised Ms. Hughes by letter that her long term disability benefits would terminate as of July 26, 2006, twenty-

four months after the effective date of her disability.  In that letter, CUNA also informed

Ms. Hughes that she could seek reconsideration of this decision if she submitted medical

information demonstrating that her inability to perform her job was due to impairments

other than chronic pain, fibromyalgia, and anxiety.  (R. at 1052-53).

**April 2006 Appeal of 24-Month Limitation on Benefits**

On April 27, 2006, Ms. Hughes appealed CUNA's decision and submitted

additional medical records for consideration.  On May 15, 2006, CUNA contacted Ms.

Hughes by letter, requesting all psychiatric medical records so that it could determine the

cause of her disability.  (R. at 1051).  On May 23, 2006, Ms. Hughes telephoned CUNA

and stated that the only psychiatric/psychological treatment she had received was at the

Pain Clinic, but that she had additional medical information to submit.  (R. at 831).

Among the materials submitted in support of this appeal, Ms. Hughes included a

radiology report dated May 10, 2006, addressing lumbar and cervical x-rays that had been

performed.  The lumbar x-ray revealed multilevel degenerative disc disease with no acute

bony abnormality, degenerative facet joint changes throughout the lower lumbar spine,

and mild dextroscoliosis.  The cervical x-rays revealed mild disc space narrowing at the

C4-C5, C5-C6, and C6-C7 levels as well as mild facet joint degenerative changes in the

mid-cervical spine.  (R. at 208).

Ms. Hughes also provided CUNA with records from her treating physicians, Gary

Wright, M.D.[2] and Dmitry Arbuck, M.D., from the Meridian Health Group. Dr. Wright diagnosed Ms. Hughes with lumbar radiculopathy, sacroilitis, sacral segmental dysfunction and lumbar facet syndrome. (R. at 102). He further reported that she "has intractable low back pain and radicular pain in spite of aggressive physical medicine treatment and pharmacological management." Id. Dr. Wright's treatment included the performance of numerous joint blocks and injections in an attempt to relieve Ms. Hughes's pain. See id. In an April 3, 2006 report, Dr. Arbuck identified Ms. Hughes's primary diagnosis as polyarthritis and opined that her "mobility and functional limitations secondary to the joint pain prevent regular work and meaningful employment." (R. at 195-96).

Finally, Ms. Hughes included a current Employee Statement with the documentation for her appeal. In that statement, she reported that she stopped working due to inflammation and pain from arthritis in her lower back. (R. at 194). She also indicated that the inflammation and pain from arthritis had spread into her pelvis, knees, shoulders, elbows, neck, hands, and feet. Id.

After receiving the additional documentation, CUNA had access to all the available medical information reviewed by Robert Petrie, M.D., who is board-certified in

_____

[2] Dr. Wright was chosen for a peer-to-peer review as part of the appeal process because Ms. Hughes told CUNA that he was the physician who best knew her condition. On July 12, 2006, CUNA advised Dr. Wright that a medical review consultant would be calling to discuss Ms. Hughes's condition. A release executed by Ms. Hughes for such a purpose was also provided to him. However, although Dr. Petrie made three attempts to contact Dr. Wright for the peer-to-peer review, Petrie never received a return telephone call from Dr. Wright. (See R. at 929).

preventive medicine, occupational medicine, and family practice. Dr. Petrie noted that Dr. Coss initially endorsed Ms. Hughes's disability in July 2004 and that, at that time, Dr. Coss reported subjective complaints of diffuse pain, decreased concentration, fatigue, poor sleep, hygiene, and anxiety. (R. at 345, 927). Dr. Petrie also reviewed Dr. Coss's August 8, 2005 report in which he (Coss) stated that Ms. Hughes suffered from significant soft tissue pain associated with fibromyalgia, degenerative arthritis affecting the spine and a history of epidural blocks and trigger point injections in the neck and trochanteric bursa. (R. at 357, 928). Additionally, Dr. Petrie recognized that Dr. Coss noted mild decreased range of motion in the cervical spine and a normal neurologic examination. (R. at 360-61, 928). Dr. Petrie further noted that Dr. Coss had diagnosed Ms. Hughes with fibromyalgia/chronic pain syndrome, osteoarthritis, easy bruising, asthma, family history of possible colon cancer, depression with anxious features, chronic hyperreflexia, as well as possible vestibular dysfunction, vasomotor symptoms, and uterine bleeding. (R. at 361-62, 928). Dr. Petrie also considered notes from an October 11, 2004 office visit with Dr. Biel in which Biel noted a several month history of complaints of pain in the low back and right leg as well as an MRI showing degenerative disc disease. (R. at 145, 928).

According to a May 17, 2005 initial pain evaluation completed by Dr. Arbuck of the Meridian Health Group ("Meridian") and reviewed by Dr. Petrie, Ms. Hughes was referred to Meridian for a psychiatric evaluation and presented with pain issues and musculoskeletal complaints. Although Ms. Hughes reported that she was "tender to touch

everywhere," she had a normal range of motion in all joints, her neurological and reflex examination was normal, and her strength in all muscle groups was rated 5/5. (R. at 377, 928). Dr. Arbuck diagnosed her at that time with a pain disorder and somatization disorder per her neurological testing, as well as polyarthralgia, fibromyalgia/myofascial pain, depression, and general anxiety disorder. (R. at 376-77, 928). As part of his review, Dr. Petrie noted that Ms. Hughes's continued treatment at Meridian included trigger point injections, physical therapy, psychotherapy, and medications, with no appreciable changes in the reported symptomology. (R. at 928). In fact, examination notes from May 18, 2006, approximately one year after she first came to Meridian, reveal that Ms. Hughes's diagnoses remained the same, namely, fibromyalgia, polyarthralgia, and lumbar, knee, and foot pain. (R. at 100).

Dr. Petrie also discussed Ms. Hughes's initial psychiatric exam at Meridian. She reported a fifteen year history of chronic pain and also complained of anxiety, nervousness, and difficulties with memory worsening over the three years prior. (R. at 928, 371). The examiner noted that Ms. Hughes mentioned pain frequently, rubbed her thighs, neck, and arms, and had multiple non-related musculoskeletal pain complaints. The examiner diagnosed Ms. Hughes with generalized anxiety disorder, somatization disorder, depression, chronic pain syndrome, and mental stress. (R. at 372, 928).

As part of his review, Dr. Petrie also reviewed a December 14, 2005 report of a pulmonary consultation with Dr. Rubeiz. Ms. Hughes's physical exam was normal, and Dr. Rubeiz's diagnosis was dyspnea on exertion of unclear etiology. (R. at 175, 928). A

24

February 15, 2006 exam noted normal lung tests and Dr. Rubeiz opined that he was unable to find the cause of her dyspnea and that he was not convinced that she suffered from reactive airway disease/asthma. (R. at 172-73, 928-29). Dr. Petrie reviewed the August 5, 2005 IME performed by Dr. Duerden and reiterated Deurden's findings of generalized chronic pain syndrome with a psychological overlay to her physical/somatic pain symptoms. (R. at 929, 938-39). In his report, Dr. Petrie noted that Ms. Hughes had the additional diagnoses of polyarthralgia, fibromyalgia, somatization disorder, low back pain with sacroiliitis and sacrosegmental dysfunction, but that there was no evidence of abnormal EMG/NCT results of lower extremities, reflexes, asymmetry, motor weakness, muscle atrophy, or neuromuscular disorder affecting the lower extremities or low back which would necessitate restrictions.[3] Dr. Petrie described Ms. Hughes as a deconditioned and chronic pain patient capable of capacity. (R. at 929).

Following his review of Ms. Hughes's medical records, Dr. Petrie concluded that she had chronic pain complaints with objective findings limited to degenerative joint disease affecting her left knee. Dr. Petrie opined that such an impairment would only impact frequent climbing or squatting with the left knee, limiting Ms. Hughes to the performance of light work. Dr. Petrie also noted subjective complaints of low back, hip,

---

[3] It is unclear whether Dr. Petrie reviewed the September 1, 2004 EMG/nerve conduction study of the right lower extremity which was labeled "abnormal" and revealed "evidence for a mild sciatic neuropathy with involvement of the tibial branch more than the peroneal branch. There is also a suggestion of some superimposed L5 and S1 nerve root irritation that is mild and chronic in nature, although there is some subacute component at L5. There is no definite electrophysiologic evidence of a peripheral polyneuropathy, peripheral entrapment neuropathy, or other lumbosacral radiculopathies." (R. at 483).

foot, and heel pain, headaches, lightheadedness, hot flashes, right leg weakness, right heel tingling and numbness, and decreased range of motion in the right leg and hip area. (R. at 929-30).

CUNA notified Ms. Hughes on August 3, 2006, that, based on Dr. Petrie's review, it was affirming its decision that benefits were payable for a maximum of twenty-four months. The notice stated in relevant part as follows:

> Based on all the information submitted[,] your disability fell under the Limitation For Specified Disorders provision in your Long Term Disability contract and we do not find you disabled from performing your occupation under a physical condition that is not covered under the Limitation for Specified Disorder provision. An attempt was made by the independent evaluator to discuss the "physical" component of your condition with your treating physician. However, as indicated prior, Dr. Wright did not respond.
>
> **If you wish further consideration of your claim, you and your physician(s) must provide:**
>
> >    Evidence that you continue to be impaired from performing your occupation due to [an] objective physical condition that is not covered under the Limitation For Specified Disorder provision in your Long Term Disability contract.
> >    Your treating physician, Dr. Gary Wright would need to contact the independent physician, Dr. Robert D. Petrie, Diplomate, American [B]oard of Preventive Medicine, Occupational Medicine Diplomate, American [B]oard of Family Practice.

(R. at 1045).

On August 21, 2006, Dr. Wright contacted Dr. Petrie for the peer-to-peer consultation. After speaking with Dr. Wright, Dr. Petrie reported as follows:

> I asked Dr. Wright what the objective findings were of impairments and resultant restrictions and limitations. Dr. Wright stated that Ms. Hughes has

cervical and lumbar spine dysfunction, a history of bursitis, history of tendinitis, osteoarthritis of her hands, and was described as having what he felt was a centrally mediated neuropathic pain syndrome. It is noted that multiple therapeutic interventions have been attempted and at the present moment, she is somewhat stabilized on overall pain medications, including antiseizure medications. He reported that she had too much pain and was largely incapable of performing any sustained activities, including sitting or standing in that she has limited relief from lying down. It is reported that she was able to perform her activities of daily living on her present medications but that she was only able to intermittently drive a motor vehicle.

(R. 918). Based on his conversation with Dr. Wright, Dr. Petrie's opinion that Ms. Hughes had chronic pain syndrome remained unchanged: "By definition, her subjective complaints far outweigh the objective findings. The objective findings would be related to her age, likely physical deconditioning, and some mild osteoarthritis particularly affecting the left knee as previously reported." Id.

Relying on Dr. Petrie's opinion that Ms. Hughes was disabled due to chronic pain syndrome, and thus subject to the 24-month maximum benefit, CUNA upheld the termination of benefits on September 11, 2006. In its denial, CUNA informed Ms. Hughes that she could obtain a "response in writing from Dr. Wright, to Dr. Petrie's report disputing the diagnosis of chronic pain syndrome and to supply all objective test results or chart notes to support that conclusion." (R. at 1038).

**March 2007 Appeal of 24-Month Limitation on Benefits**

On March 6, 2007, Ms. Hughes again appealed CUNA's termination of her disability benefits. However, she refused to provide CUNA with an authorization to obtain records, to obtain a peer review, or to submit to a functional capacity evaluation

27

("FCE") or an IME.  In support of her appeal, she did submit current medical records,

including a November 4, 2006 lumbar spine MRI, a physician statement and letter from

Dr. Wright, and a FCE completed by David Cross, M.D. of the Indianapolis

Rehabilitation Agency.  After conducting the FCE testing, Dr. Cross concluded that,

based on the results of those tests, Ms. Hughes had no potential for work.  (R. at 84).

When compared to a prior MRI from 1996, the November 4, 2006 MRI showed

progressive degenerative scoliosis with moderate dextroscoliosis centered at

approximately L2-3.  (R. at 074).  The 2007 MRI also revealed the following:

> 1.     Moderately severe degenerative disc disease at L3-4 and L4-5 which
> has developed since the previous study, associated with degenerative
> scoliosis.
> 2.     Grade I spondylolisthesis at L4-5 secondary to moderately severe
> facet joint degeneration, also representing a new finding compared to
> the previous study.
> 3.     Advanced facet joint degeneration on the right at L5-S1 with
> multiple small synovial cysts, which impinge upon the right S1 nerve
> root.  Moderately severe up-down foraminal stenosis on the right
> results in possible right L5 root impingement, in addition.  Clinical
> correlation with signs and symptoms of right S1 and/or L5
> radiculopathy.

(R. at 075).

In his letter responding to the record reviewing report completed by Dr. Petrie, Dr.

Wright stated as follows:

> I began treating Ms. Hughes on or about 6/8/05, and she has been under my
> care since then.  She has had extensive and comprehensive treatment since
> coming under my care.  Her treatment has included, but wasn't limited to,
> physical therapy, chiropractic care, psychological & psychiatric care,
> pharmacological management, and interventional treatment. Essentially all
> of her therapies were beneficial in varying degrees lasting for different

length of times. . . . In addition, Ms. Hughes has had several interventional treatments including S1-J blocks, lumbar facet blocks, greater trochanteric blocks, Epidurals and selective nerve root blocks.  All of the injections were beneficial to her, but she didn't get any long term relief.

Based on all the physical and psychological conditions from which Ms. Hughes suffered, my opinion remains that she is unable to participate in any meaningful work.  Thus, in my opinion, Ms. Hughes is permanently and totally disabled.  My opinion is obviously contrary to Dr. Petrie's decision that Ms. Hughes could perform at least some sort of sedentary work, but he formed his opinions by reviewing Ms. Hughes' records, by using his experience with other patients who may have had complaints similar to Ms. Hughes, and some of his determination of her ATW [ability to work] was based purely on speculation.

Since I am the treating physician and in light of the fact that I am also a Board Certified Occupational Physician as well as a Certified [Independent] Medical Examiner, I feel that I am in a better position to determine Ms. Hughes' ATW.

(R. at 078-079).

Beyond the MRI, physician statement and letter from Dr. Wright, and the FCE conducted by Dr. Cross, Ms. Hughes did not provide CUNA with authorization to obtain additional medical records.  Thus, CUNA's medical review was limited only to those records to which it had access.  That review occurred on June 20, 2007, by Dr. Silver, who had conducted one of the previous reviews of Ms. Hughes's claim in 2005.  After reviewing all the available medical evidence,[4] Dr. Silver opined in relevant part as

_____

[4] In addition to all of the medical evidence already discussed above, Dr. Silver reviewed the following: (1) an April 15, 2004 letter from Dr. Scott A. Fretzin to Dr. Coss showing benign dermatologic problems that did not need treatment; (2) May 3, 2004 and May 21, 2004 office notes from Dr. George Hicks noting a normal EMG balance test, chair test, and audiogram; (3) notes from an August 4, 2004 visit to the Hook Rehab Pain Program recommending Ms. Hughes undergo personality testing, neuropsychiatric testing, and counseling; (4) a November 9, 2005

(continued...)

follows:

> Despite all the diagnoses that are given there is no documentation in any of the medical records of objective findings save for the objective studies of roentgenographic CT, MRI, or x-rays.  The claimant has a general anxiety disorder.  The claimant has a [sic] depression.  The claimant has a somatization disorder.  The claimant has neck pain, yet she has a relatively full normal range of motion of the neck, records suggest with some pain at the extremes of range of motion and on occasion some loss of range of motion at the extremes of range of motion of her cervical spine.  There are no focal neurological deficits in the upper or lower extremities.  Even though there is electrophysiological finding of bilateral carpal tunnel "mild chronic carpal tunnel" syndromes by Andrea Haller, M.D., at no time, has there been a positive Phalen's test, positive reverse Phalen's test, loss of two-point discrimination, positive wrist compression test, loss of functionality of the right upper extremities.  No Jamar dynamometer studies are noted.  Thus, on a medical evidence based review of the medical records available, there is no loss of functionality of the cervical spine and there is no loss of functionality of right or left upper extremity and there are no focal neurological deficits in the upper or lower extremities save for the electrodiagnostic studies as performed by Andrea Haller, M.D.

> She is given a diagnosis of cervical segmental disorder, cervicothoracic myofascitis, cervical IVDD, (presumably this is intervertebral degenerative disc disease or intervertebral disc displacement), polyarthritis, Raynaud's phenomenon, ([t]his is the first time that Raynaud's disease has ever been entered into a diagnosis in any of the medical records throughout all of the years that the medical records have been reviewed for), insomnia, malaise, fatigue, hormonal imbalance, sciatica, lumbar facet syndrome, lumbar IVDD, sacroiliitis and sacral segmental dysfunction.  In reference to the sciatica, there is no clinical diagnosis of sciatica.  There is no focal neurological deficit in the lower extremity.  The claimant has no antalgic

---

[4](...continued)
emergency room visit note from Dr. Jeffrey Brunett, in which prior chest CTs, echo and Dopplar studies, and treadmill and echocardiogram tests were noted as normal; (5) February 24, 2006 correspondence from Dr. Randall Riley that showed no focal neurological deficits, no pathological reflexes, and no evidence of abnormalities in the upper or lower extremities with any loss of functionality; (6) May 10, 2006 x-rays of the lumbosacral and cervical spine showing degenerative disc disease with no acute bony abnormalities; and (7) normal arthrograms from November 13 and November 20, 2006.

gait. The claimant can walk heel-heel, toe-toe, and heel toe and in tandem without any difficulty. The claimant has no pathological reflexes or abnormal reflexes. There is no motor or sensory deprivation in the lower extremities. The claimant has no documentation in any of the medical records throughout all of the years of being examined of any loss of range of motion of the lumbosacral spine, except on one or two occasions where there is some loss of range of motion at the extremes but there is no paravertebral spasm. There was tenderness and there is no paravertebral spasm.

She did have sacroiliitis bilaterally, intermittently, that was treated on several occasions with injections and then most recently by Dr. Wright with injections. There is no sacral segmental dysfunction that is identified in the medical records and thus there is no loss of functionality of the lumbosacral spine. There is no loss of functionality of right or left lower extremity. Based on all the physical and psychological conditions from which Ms. Hughes suffered his opinion remains that she is unable to participate in any meaningful work and that she is permanently and totally disabled. He feels that his opinion is contrary to Dr. Petrie's decision that Ms. Hughes could perform at least some sort of sedentary work in that he only formed his pinions by reviewing her records or using his experience with other patients who may have had a complaint similar to Ms Hughes, that some of his determination of her ability to work was purely based on speculation.

I have reviewed her records; this is the second time I am reviewing her records; and I respectfully would have a professional difference of opinion with Gary H. Wright, M.D. He felt, as he is a board certified occupational physician and certified as an independent medical examiner and because he is the clinician who has been treating her, that he was in a better determination position to determine Ms. Hughes' ability to work. After a thorough review of the medical records available, the claimant's subjective complaints remain unsubstantiated by objective clinical findings from an orthopedic standpoint musculoskeletally that would prevent her from returning to sedentary work. I am speaking purely as an orthopedic surgeon. I am not responding to . . . numerous medical problems or to her numerous somatization disorder or to her numerous psychological issues.

(R. at 912-14). Dr. Silver also commented on the FCE completed by Dr. Cross, noting

that Cross was a treating therapist and that there was no documentation as to the manner

in which the FCE was performed.  (R. at 914).

From an orthopedic perspective, based on his review of the available medical records, Dr. Silver diagnosed Ms. Hughes with cervical spine pain, discogenic disc disease of the cervical spine, low back pain, and discogenic disease of the lumbosacral spine.  (R. at 916).  With respect to the cervical and lumbar diagnoses, Dr. Silver reiterated that the areas demonstrated no loss of functionality and no focal neurological deficits.  Id.  Dr. Silver ultimately concluded that, "[t]he chart review shows that the claimant is capable of working her normal occupation doing sedentary work.  There is nothing in all of the medical records that are reviewed either the first time or the second time that shows the claimant's subjective complaints are substantiated by objective clinical findings that would prevent her from working in a sedentary capacity despite the FCE that was performed in February 2007."  (R. at 916).

**Defendant's Final Denial and the Instant Litigation**

On July 9, 2007, CUNA requested an additional 45-day extension to make a decision on Ms. Hughes's appeal in order to obtain a FCE pursuant to its rights under the applicable plan documents.  However, on July 23, 2007, Ms. Hughes indicated that she would not participate in the FCE, and thus, on August 2, 2007, CUNA indicated that it was canceling the previously scheduled FCE.  On August 17, 2007, CUNA again upheld its decision to terminate Ms. Hughes's benefits under the 24-month limitation for subjective disorders, anxiety, and depression.  (R. at 1020).  On that same date, CUNA informed Ms. Hughes that she had exhausted the administrative appeals for her claim and

that further administrative appeals would not be accepted.  (R. at 1021).

According to Ms. Hughes, CUNA did not provide her with a copy of Dr. Silver's second review report prior to reaching its determination or notifying her that her appeal was denied.  When she learned that her appeal had been denied, she provided a copy of the report to her treating physician, Dr. Wright, as soon as she received it from CUNA. On November 16, 2007, Dr. Wright responded to Dr. Silver's report, opining that the documented abnormal physical findings of her cervical and lumbar spine, objective findings of bilateral CTS, and significant and severe osteoarthritis, among other conditions, rendered Ms. Hughes totally and permanently disabled.  (R. at 880-83).  Dr. Wright stated that Ms. Hughes "had documented objective findings of problems that literally covered her from head to toe."  (R. at 883).  He also reiterated that neither Dr. Petrie nor Dr. Silver had personally examined Ms. Hughes and that, as a board certified occupational physician, Certified Independent Medical Examiner, and a pain management specialist, he (Wright) was in the best position to determine Ms. Hughes's ability to sustain work.  (R. at 881, 883).

Ms. Hughes submitted to CUNA Dr. Wright's response as well as a demand that CUNA consider the response and a request for a copy of relevant documents and information pertaining to her claim that had not been provided up to that date.  On December 31, 2007, CUNA indicated that, because she had exhausted her administrative appeals, it would not further review her claim.  It also refused to provide any of the documents or information requested by Ms. Hughes because it had "previously provided

33

[her] with the administrative record relative to the claim."  (R. at 1019).  On January 25,

2008, Ms. Hughes filed the present lawsuit against CUNA alleging that it wrongfully

denied her employee benefits.

## Legal Analysis

### I.    Summary Judgment Standard

Summary judgment is appropriate when the record shows that there is "no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Disputes concerning material facts are genuine where the evidence is such that a

reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material

fact exist, the court construes all facts in a light most favorable to the non-moving party

and draws all reasonable inferences in favor of the non-moving party.  See id. at 255.

However, neither the "mere existence of some alleged factual dispute between the

parties," id. at 247, nor the existence of "some metaphysical doubt as to the material

facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will

defeat a motion for summary judgment.  Michas v. Health Cost Controls of Illinois, Inc.,

209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of

the basis for its motion, and identifying those portions of [the record] which it believes

demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.

The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. <u>Id.</u> at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. <u>Waldridge v. Am. Hoechst Corp.</u>, 24 F.3d 918, 920 (7th Cir. 1994). Thus, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. <u>See</u> <u>Shields Enter., Inc. v. First Chicago Corp.</u>, 975 F.2d 1290, 1294 (7th Cir. 1992); <u>Wolf v. City of Fitchburg</u>, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated. <u>See</u> <u>Celotex</u>, 477 U.S. at 322; <u>Ziliak v. AstraZeneca LP</u>, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." <u>Celotex</u>, 477 U.S. at 323.

Courts often confront cross-motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief. "In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard." <u>Kohl v. Ass'n. of Trial Lawyers of Am.</u>, 183 F.R.D. 475 (D.Md.1998). Thus, in determining whether genuine and material factual disputes exist in the case before us, the Court has considered the parties' respective memoranda and the exhibits attached thereto,

and has construed all facts and drawn all reasonable inferences therefrom in the light most favorable to the respective non-movant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

## II.    Standard of Review

Both parties agree that the Plan provides discretionary authority to CUNA to determine Ms. Hughes's eligibility for benefits, and thus, the arbitrary and capricious standard of review applies here. See Williams v. Aetna Life Ins. Co., 509 F.3d 317, 321 (7th Cir. 2007). Under this standard, a court will uphold a plan's decision to terminate benefits as long as it has "rational support in the record." Davis v. Unum Life Ins. Co. of Am., 444 F.3d 569, 576 (7th Cir. 2006) (quoting Leipzig v. AIG Life Ins. Co., 362 F.3d 406, 409 (7th Cir. 2004)). This means that the determination will be upheld as long as "'(1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem.'" Sisto v. Ameritech Sickness and Accident Disability Benefit Plan, 429 F.3d 698, 700 (7th Cir. 2005) (quoting Houston v. Provident Life & Accident Ins. Co., 390 F.3d 990, 995 (7th Cir. 2004)).

However, the denial will not be upheld "when there is an absence of reasoning in the record to support it." Hackett v. Xerox Corp. Long-Term Disability Income Plan, 315 F.3d 771, 774-75 (7th Cir. 2003). Even under this deferential standard of review, ERISA

requires that "specific reasons for denial be communicated to the claimant and that the claimant be afforded an opportunity for 'full and fair review' by the administrator." Ponsetti v. GE Pension Plan, 614 F.3d 684, 693 (7th Cir. 2010) (quoting Halpin v. W.W. Grainger, Inc., 962 F.2d 685, 688 (7th Cir. 1992)).

The Supreme Court has held that a structural conflict of interest exists where, as here, the administrator has both the discretionary authority to determine eligibility for benefits as well as the obligation to pay the benefits when awarded. Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105 (2008); see also Jenkins v. Price Waterhouse Long Term Disability Plan, 564 F.3d 856, 861 (7th Cir. 2009). Under Seventh Circuit law, an administrator's conflict of interest is "a key consideration" under the arbitrary and capricious standard. Holmstrom v. Metropolitan Life Ins. Co., 615 F.3d 758, 766 (7th Cir. 2010). This means that "the conflict of interest is 'weighed as a factor in determining whether there is an abuse of discretion.'" Id. at 767 (quoting Glenn, 554 U.S. at 115).

## III.    Discussion

Ms. Hughes argues that she is entitled to summary judgment in her favor because, in determining that she is ineligible for benefits beyond twenty-four months, CUNA failed to consider the objective evidence establishing that her disability is caused by non-subjective disorders, failed to explain its departure from reliable evidence supporting her claim, and committed direct violations of the ERISA regulations. CUNA, on the other hand, requests summary judgment on Ms. Hughes's ERISA claim, arguing that it provided a full and fair review of Ms. Hughes's claim, and that its decision to limit her

benefits to twenty-four months, pursuant to the limitation in the Plan for subjective disorders, was fully supported by the record and was not arbitrary and capricious. We address these arguments in turn.

###### A.    Objective Evidence of Disability

As discussed above, our task is not to make an independent decision regarding Ms. Hughes's benefits claim; it is to determine whether CUNA's decision that Ms. Hughes's claimed disability is caused primarily by mental/nervous disorders (or subjective disorders as defined under the relevant policy language) and is thus subject to the 24-month limitation for such disorders was arbitrary and capricious. When measured against that deferential standard, we find no basis for overturning Defendant's decision. Ms. Hughes claims that CUNA selectively focused on her diagnoses of fibromyalgia, chronic pain disorder, and anxiety, completely disregarding substantial objective evidence of non-subjective diagnoses. In making its decision, Ms. Hughes alleges that CUNA departed from her treating physicians' opinions without adequate explanation. In support of this contention, Ms. Hughes cites to various MRIs, x-rays, and a nerve conduction study that she claims CUNA's reviewing physicians arbitrarily dismissed or discredited and which she maintains establish a direct correlation between her objectively-documented osteoarthritis and degenerative disc disease and the pervasive joint pain that prevented her from working. Ms. Hughes argues that CUNA's "cherry-picking" of the evidence to support the denial of her benefits was arbitrary and capricious. See Leger v. Tribune Co. Long Term Disability Ben. Plan, 557 F.3d 823, 832-33 (7th Cir. 2009) (holding denial

decision was arbitrary where insurer "cherry-picked the statements from her medical history that supported the decision to terminate her benefits, while ignoring a wealth of evidence to support her claim that she was totally disabled").

The factual record before us does not support these criticisms, however.  It is clear from their numerous and detailed reports that CUNA's reviewing physicians did in fact consider the objective evidence submitted by Ms. Hughes, but, upon review, disagreed with the conclusion of her treating physicians that the primary cause of her disability was her musculoskeletal conditions as opposed to a mental/nervous disorder.  ERISA imposes no duty on the administrator to accord special deference to the opinions of treating physicians, nor does the Act require a heightened burden of explanation when an administrator rejects a treating physician's opinion.  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003).  Thus, it is within CUNA's discretion to depart from the opinions of Ms. Hughes's treating physicians as long as its medical consultants provided non-arbitrary explanations, based on the evidence, for that departure.  See Williams, 509 F.3d at 321-22.  We conclude that, in making its decision, CUNA properly considered those explanations.

Here, both Dr. Petrie and Dr. Silver reviewed and addressed the relevant medical records and provided reasonable explanations for their departures from Ms. Hughes's treating physicians' opinions.  In his record review report, Dr. Petrie cited to the fact that, although Ms. Hughes had musculoskeletal complaints, she was found to have normal range of motion in the affected areas.  His review of the relevant medical records

disclosed that there was no evidence of abnormal objective test results to explain her subjective complaints. Dr. Silver acknowledged, based upon his review of the relevant medical evidence, that various objective tests, such as x-rays and MRIs, showed evidence of degenerative disc disease, spondylolisthesis, and joint degeneration. However, he noted that the areas affected, specifically the cervical and lumbar regions, demonstrated no loss of functionality and no focal neurological deficits that would prevent her from working in a sedentary capacity. Ms. Hughes criticizes Dr. Silver's alleged failure to address the FCE report completed by Dr. Cross in which Dr. Cross opined that Ms. Hughes was unable to work. Dr. Silver did address the FCE in his report, however. He acknowledged the restrictions and limitations set forth in the FCE report, but noted that Dr. Cross failed to document how it was performed. Moreover, because the FCE did not address whether the stated restrictions were required as a result of Ms. Hughes's subjective or objective conditions, the results were not particularly relevant to the determination at issue.

In sum, although it is true that Ms. Hughes presented evidence that, in addition to fibromyalgia, chronic pain disorder, and anxiety, she suffers from certain musculoskeletal conditions that do not fall under the Plan's 24-month limitation provision for subjective disorders, the record contains substantial evidence from which it could be reasonably concluded that the *primary* cause of her inability to work was one or more of the subjective disorders from which she suffers. In light of the thorough and complete reviews conducted by CUNA, the fact that it chose to reject evidence presented by Ms.

Hughes that her condition was physical and accept opposing evidence that it found more persuasive does not, under the circumstances presented in this case, compel a finding that it abused its discretion. Cf. Fischer v. Liberty Life Assur. Co. of Boston, 576 F.3d 369, 377 (7th Cir. 2009) ("While Fischer did present substantial evidence that his condition was organic, it was not an abuse of discretion for Liberty to reject Fischer's evidence in favor of contrary and, at least in Liberty's view, more compelling evidence."). We acknowledge that CUNA could have provided a more complete explanation of the evidence in its letters of denial to Ms. Hughes, but the information provided in those letters is sufficient to indicate that CUNA's reliance on the opinions of Drs. Petrie and Silver was not arbitrary and capricious.

**B.      Direct Violations of ERISA Regulations**

We next turn to Ms. Hughes's contention that, during the processing of her claim, CUNA engaged in direct violations of the applicable ERISA regulations. Specifically, Ms. Hughes advances the following two allegations: First, that in 2007, CUNA improperly requested that Dr. Silver evaluate the medical records filed in support of one of Ms. Hughes's appeals, after he had previously rendered an opinion regarding Ms. Hughes's ability to work in connection with her initial application for benefits. Second, Ms. Hughes claims that CUNA directly violated the ERISA regulations by utilizing one claim specialist, Patti Miller, throughout the entirety of the processing of Hughes's claim for benefits.

Regarding Ms. Hughes's contention that CUNA improperly utilized a single claim

41

specialist, Ms. Miller, throughout her appeals, a full and fair review requires a plan to provide "a review that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual." 29 C.F.R. § 2560.503-1(h)(3)(ii). CUNA concedes that Ms. Miller was the author of each of Ms. Hughes's denial letters, but claims that she was merely the initial decision maker and coordinator of each of Hughes's appeals, but that she (Miller) did not make the final determination as to any of those appeals.

Although it is not entirely clear from the record what Ms. Miller's role entailed as "the initial decision maker," the appeals committee's review notes show that CUNA's decision to uphold its termination of benefits on Hughes's first appeal was decided by Cathy Beaty and that the second appeal was decided by Kimberly Jameson. We find nothing in the record that undermines CUNA's description of Ms. Miller's relatively minor level of involvement in the decision-making process. While it appears that Ms. Miller had a role in processing claims and appeals for CUNA, there is no evidence in the record that she was responsible for making final claim determinations. Accordingly, we hold that Ms. Miller's involvement in Ms. Hughes's claim did not violate 29 C.F.R. § 2560.503-1(h)(3)(ii).

Nor do we find that Dr. Silver's participation in two of the reviews conducted by CUNA of Ms. Hughes's claim denied her a full and fair review. ERISA's procedural

regulations provide that, when deciding an appeal of any adverse benefit determination that is based at least in part on a medical judgment, a plan must consult with an appropriate health care professional "who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual." 29 C.F.R. § 2560.503-1(h)(3)(iii), (v). Here, it is undisputed that, in 2005, Dr. Silver reviewed Ms. Hughes's medical records in connection with her appeal of the initial denial of her benefits claim, and again, in 2007, he performed a second records review, this time in connection with Ms. Hughes's appeal regarding application of the 24-month limitations period. Ms. Hughes contends that CUNA's reliance on Dr. Silver's second review in denying her 2007 appeal constitutes a violation of 29 C.F.R. § 2560.503-1(h)(3)(v).

CUNA rejoins that there were two separate adverse benefit determinations made regarding Ms. Hughes's claim: one pertaining to her initial claim for benefits, which was originally denied and then subsequently approved, and the other pertaining to the 24-month limitation on her benefits. Thus, according to CUNA, although Dr. Silver rendered an unfavorable report during an appeal of the first adverse benefit determination, CUNA's reliance on his second report in support of the decision to limit Ms. Hughes's benefits to twenty-four months was not violative of ERISA's regulations because that decision was a part of an entirely separate adverse benefit determination. Accordingly, CUNA maintains Dr. Silver's involvement in the appeals process of what CUNA defines as two separate claims does not fall within the prohibition contained in § 2560.503-

1(h)(3)(v).

We have reviewed § 2560.503-1(h)(3)(v) in light of the facts before us, and are not persuaded that Dr. Silver's participation in the case at bar is violative of ERISA's procedural regulations. Although CUNA's initial decision to deny Ms. Hughes's benefits claim and its subsequent decision to limit her eligibility for benefits to a 24-month period are related determinations in that they both relate to Ms. Hughes, they are clearly distinct issues. Thus, because Dr. Silver was consulted on the appeals of two separate benefit determinations in our considered judgment, his participation did not violate the terms of § 2560.503-1(h)(3)(v), in that he was never consulted in the initial adverse benefit determinations that became the subject of either of her appeals. Accordingly, Dr. Silver's participation did not deny Ms. Hughes a full and fair review of her claim.

### C.    CUNA's Failure to Consider Dr. Wright's Response

Ms. Hughes also contends that she was denied a full and fair review of her claim because CUNA did not allow her treating physician, Dr. Wright, to submit a response to Dr. Silver's final record review. However, as CUNA points out, under the ERISA regulations, it was only required to provide Ms. Hughes with a single appeal. See 29 C.F.R. § 2560.503-1. By August 2007, when CUNA sent its final denial letter to Ms. Hughes informing her that it had determined she was "not disabled from performing her occupation due to a physical condition that is not covered under the definition of subjective disorder" and that her administrative appeals had been exhausted, (R. at 1020), she had already been afforded two appeals of CUNA's decision to limit her benefits to 24

months.  Accordingly, CUNA had no obligation either to provide Ms. Hughes with an opportunity to respond or to consider the November 16, 2007 report that Dr. Wright submitted in response to Dr. Silver's record review.  Moreover, in his November 16 report, Dr. Wright referred to no new medical records, limiting his report primarily to reiterations of the opinions that he had previously provided in support of Ms. Hughes's claim, which Dr. Silver had had the opportunity to fully review and consider before rendering his contrary opinion.  For these reasons, CUNA's failure to consider Dr. Wright's second report was not *ultra vires* and, in any event, as a matter of law and fact, CUNA did not deny Ms. Hughes a full and fair review of her claim on this basis.

### D.    Conflict of Interest

Finally, Ms. Hughes makes much of the fact that, as both the decisionmaker on benefits and the payor of any benefits awarded, CUNA has an inherent conflict of interest.  As discussed above, the Seventh Circuit recognizes that the existence of such a conflict of interest is one factor to be considered in determining whether a decision was arbitrary and capricious and that, "[w]hen the case is borderline ... the inherent conflict of interest ... can push it over the edge – towards a finding of capriciousness."  <u>Jenkins</u>, 564 F.3d at 861-62.  Because we find, for the reasons detailed above, that this is not such a borderline situation, the conflict-of-interest factor had no significant impact on our analysis, nor should it have.

### IV.    Conclusion

For the reasons detailed in this entry, we <u>DENY</u> Plaintiff's Motion for Summary

Judgment and <u>GRANT</u> Defendant's Motion for Summary Judgment. Final judgment

shall be entered accordingly.

      IT IS SO ORDERED.


Date: _____03/14/2011_____

                                        SARAH EVANS BARKER, JUDGE
                                        United States District Court
                                        Southern District of Indiana

Copies to:

Jennifer Jay Kalas
HINSHAW & CULBERTSON
jkalas@hinshawlaw.com

Renee J. Mortimer
HINSHAW & CULBERTSON
rmortimer@hinshawlaw.com

Bridget L. O'Ryan
O'RYAN LAW FIRM
boryan@oryanlawfirm.com

Daniel Keenan Ryan
HINSHAW & CULBERTSON
dryan@hinshawlaw.com

Amanda Lynn Yonally
O'RYAN LAW FIRM
ayonally@oryanlawfirm.com